| | |
|---|---|
| CARMELINA TORRES,<br>*Plaintiff,*<br><br>v.<br><br>NANCY A. BERRYHILL, ACTING<br>COMMISSIONER OF THE SOCIAL<br>SECURITY ADMINISTRATION,<br>*Defendant.* | No. 3:18-cv-961 (VAB) |

## RULING ON MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Carmelina Torres filed for Social Security disability insurance benefits under Section

205(g) of the Social Security Act, as amended by 42 U.S.C. § 405(g), which Administrative Law

Judge ("ALJ") Ronald J. Thomas denied. Social Security Transcripts by Social Security

Administration, ECF No. 16 ("Tr."), at 22.

Ms. Torres now moves for a judgment on the pleadings. First Motion for Judgment on the

Pleadings, ECF No. 20.

In response, Nancy Berryhill, Acting Commissioner of the Social Security

Administration ("Acting Commissioner"),[1] has moved for an order affirming the ALJ's decision.

Motion to Affirm the Decision of the Commissioner, ECF No. 25.

---

[1] *See* Commissioner Bio, accessed Jul. 9, 2019, https://www.ssa.gov/agency/commissioner.html; Press Release, Social Security Administration, Social Security Welcomes its New Commissioner (Jun. 17, 2019), https://blog.ssa.gov/social-security-welcomes-its-new-commissioner/. Under Rule 25(d) of the Federal Rules of Civil Procedure, when a party in an official capacity resigns or otherwise ceases to hold office while the action is pending, the officer's successor is automatically substituted as a party, regardless of the party's failure to so move or to amend the case caption. Fed. R. Civ. P. 25(d). The Court also may also order the substitution of a party at any time. *See Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018); *Tanvir v. Tanzin*, 894 F.3d 449, 459 n.7 (2d Cir. 2018). Accordingly, the Court directs the Clerk of the Court to amend the docket and case caption to reflect that Andrew M. Saul, Commissioner of the Social Security Administration, is now the named Defendant in this action.

For the following reasons, the Court **GRANTS** the motion for judgment of acquittal **DENIES** the motion to affirm the Commissioner's decision.

This case is remanded solely for the calculation and payment of benefits.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Allegations

On January 7, 2014, Ms. Torres awoke at 3:00 a.m. after feeling severe and sharp lower back pain. January 7, 2014 Medical Notes by Jadonna, Scala, M.D., Tr. at 675. It took Ms. Torres a half of an hour to get out of bed that day; she was initially unable to stand. *Id.* During a physical examination, Ms. Torres was unable to get up from a wheelchair. *Id.* After an injection of Toradol, Ms. Torres was able to lean forward for a limited examination, but still could not walk. *Id.* at 676. She also had limited movement in any direction, with pain during minimal movements. *Id.*

As far back as January 2015, Ms. Torres has suffered from chronic back pain. Progress Notes, Tr. at 327 (reporting "persistent back pain" on January 21, 2015), 330 (reporting "chronic back pain" during a follow up on April 21, 2015), 337 (reporting back pain six weeks after lumbar surgery on November 19, 2015).

As of September 11, 2015, Ms. Torres claims disability from a combination of fibromyalgia,[2] major depressive disorder, generalized anxiety disorder, panic attacks, chronic pain associated with significant psychosocial dysfunction, lower back pain, plantar fasciitis,[3] degenerative disk disorder of the lumbar spine, and obesity. Complaint, ECF No. 1 ("Compl."), at ¶¶ 4, 5.

---

[2] "A syndrome of chronic pain of musculoskeletal origin but uncertain cause." *Green-Younger v. Barnhart*, 335 F.3d 99, 101 n.1 (2d Cir. 2003) (citing STEDMAN'S MEDICAL DICTIONARY 671 (27th ed.2000)).
[3] "[I]nflammation of the plantar fascia, most usually noninfectious, and often caused by an overuse mechanism; elicits foot and heel pain." STEDMAN'S MEDICAL DICTIONARY 322870 (2014)

On September 15, 2015, Ms. Torres underwent a successful percutaneous laser disk compression. ALJ Decision, Tr. at 16. Ms. Torres's medical notes reveal that throughout her physical therapy in November 2015, her strength improved, and back pain lessened. *Id.* at 17.

### 1. Disability Applications

On March 11, 2016, Ms. Torres applied for disability insurance and supplemental security income benefits. Application Summary for Disability Insurance Benefits, Tr. at 216; Application Summary for Supplemental Security Income, Tr. at 218.

On May 24, 2016, the Social Security Administration ruled Ms. Torres not disabled. Disability Decision, Tr. at 116.

On June 1, 2016, Ms. Torres requested a reconsideration of her disability determination. Request for Reconsideration, Tr. at 125.

On June 24, 2016, the Social Security Administration denied Ms. Torres's request for reconsideration. Notice of Reconsideration, Tr. at 129.

On July 30, 2016, Ms. Torres requested an ALJ hearing. Request for Hearing by Administrative Law Judge, Tr. at 136.

On September 15, 2017, Ms. Torres had a hearing before ALJ Thomas. Compl. at ¶ 8.

### 2. Medical Opinions

#### a. Back Treatment Physician

Both before and after her alleged disability onset date Ms. Torres saw Dr. Arpad Fejos, M.D. on many occasions for her back issues.

On October 27, 2014, Ms. Torres went to Orthopedic Associates of Middletown for lower back pain, which she described as "aching and stabbing in her back with burning in her legs." Office Treatment Records, Tr. at 781. By that time, she had tried physical therapy and

chiropractic care for pain stemming from a February 15, 2014 auto accident. *Id.* Dr. Fejos

observed that Ms. Torres's gait was to the right, there was muscle tension throughout the lumbar

spine, and deep tendon reflexes were absent. *Id.*

On November 5, 2014, Dr. Fejos recommended a trial of epidural steroid injections after

a magnetic resonance imaging ("MRI") revealed evidence of disk bulging. Office Treatment

Records, Tr. at 783.

On November 13, 2014, Ms. Torres received an epidural steroid injection. Office

Treatment Records, Tr. at 784.

On November 24, 2014, during a follow-up, Ms. Torres reported that she had no

improvement after the injection and continued to have lower back and bilateral leg pain. Office

Treatment Records, Tr. at 785. Dr. Fejos noted that Ms. Torres had satisfactory gait and thirty

degrees of lumbosacral flexion that worsens her back pain. *Id.*

On December 10, 2014, Dr. Fejos noted that Ms. Torres continued to have the same pain

as before her first injection. Office Treatment Records, Tr. at 786. As a result, Dr. Fejos

recommended another injection. *Id.*

On December 15, 2014, Ms. Torres received another epidural steroid injection. Office

Treatment Records, Tr. at 787.

On December 31, 2014, Ms. Torres reported an eighty percent improvement for one week

after the epidural injection. Office Treatment Records, Tr. at 788. But she also reported that she

continued to have lower back pain and bilateral leg pain. *Id.* Dr. Fejos recommended a repeat

lumbar epidural injection. *Id.*

On February 12, 2015, doctors performed a bilateral epidural injection for Ms. Torres's

disk bulge, with no evidence of procedural complications. February 12, 2015 Treatment Notes,

Tr. at 385.

On February 25, 2015, Dr. Fejos noted that Ms. Torres had three lumbar epidural steroid injection and that it only provided a day or two of pain relief before returning to her pre-procedure pain. February 25, 2015 Treatment Notes, Tr. at 384. At the time, Dr. Fejos recommended therapeutic options. *Id.*

On April 1, 2015, Ms. Torres expressed that she wanted to have back surgery. April 1, 2015 Treatment Notes, Tr. at 383. Her physical condition was unchanged. *Id.*

On April 18, 2016, Ms. Torres had an MRI, which found multi-level degenerative disk disease. April 18, 2016 Treatment Notes, Tr. at 386.

On May 6, 2015, Ms. Torres's physical condition was unchanged. *Id.*

On June 8, 2015, Dr Fejos examined Ms. Torres and found that she still had pain with flexion, but none with extension. June 8, 2015 Treatment Notes, Tr. at 381. Dr. Fejos recommended moving forward with the disk operation. *Id.*

On August 25, 2015, a physical examination revealed that Ms. Torres still had pain with flexion, but none with extension. August 25, 2015 Treatment Notes, Tr. at 380.

On September 15, 2015, Ms. Torres had a percutaneous laser disk decompression operation for a disk bulge. Operative Report, Tr. at 378. Dr. Fejos, reported that Ms. Torres had a successful operation. *Id.*

On September 22, 2015, Dr. Fejos saw Ms. Torres for a follow up after her laser disk decompression surgery. September 22, 2015 Treatment Notes, Tr. at 377. Dr. Fejos noted that Ms. Torres felt her back pain worsened. *Id.* During a physical examination, Dr. Fejos also noted that there was increased muscle tension throughout the lumbar spine and a decreased range of motion in all directions. *Id.* Based on this assessment, Dr. Fejos recommended physical therapy

and renewed her Percocet and Meloxicam prescriptions. *Id.*

On October 20, 2015, Dr. Fejos examined Ms. Torres. Dr. Fejos noted that Ms. Torres had difficulty getting in on time. October 20, 2015 Treatment Notes, Tr. at 376. Dr. Fejos noted that Ms. Torres still had pain within the range of motion of her lumbar spine. *Id.* Based on her symptoms, Dr. Fejos recommended Percocet, Meloxicam, and Flexeril for Ms. Torres's back pain and encouraged aquatic therapy. *Id.* Dr. Fejos also restricted Ms. Torres to sedentary duty at her job. *Id.*

On December 16, 2015, Dr. Fejos examined Ms. Torres. Dr Fejos noted that Ms. Torres made some progress walking and standing due to therapy but was far behind her anticipated recovery. December 16, 2015 Treatment Notes, Tr. at 375. Dr. Fejos found that Mr. Torres still had pain with range of motion in all directions. *Id.* At that time, Dr. Fejos recommended physical therapy and checking in with Ms. Torres in three months, if pain worsened. *Id.*

On March 8, 2016, Dr. Fejos examined Ms. Torres. Dr. Fejos noted that six months after her percutaneous laser disc compression, Ms. Torres had minimal improvement in her symptoms. March 8, 2016 Treatment Notes, Tr. at 374. Dr. Fejos recommended another MRI of the lumbar spine to rule out any other issues with Ms. Torres's back. *Id.*

That same day, Dr. Fejos completed Family Medical Leave Act forms for Ms. Torres. Dr. Fejos determined that Ms. Torres's condition started in December 2014 and will continue for an unknown duration. Family Medical Leave Act Form, Tr. at 369. Dr. Fejos expected that Ms. Torres would need physical therapy for four months. *Id.* And Dr. Fejos attested that Ms. Torres was not unable to perform her job functions due to the condition. *Id.* Dr. Fejos also estimated that the ending date of Ms. Torres's period of incapacity would be October 2016.

On April 26, 2016, Dr. Fejos had an MRI follow up with Ms. Torres for her disk bulge

where he noted that the MRI of Ms. Torres's lumbar spine is unchanged. April 26, 2016 Treatment Notes, Tr. at 373. At the time, Ms. Torres was taking three Percocet per day, even though doctors prescribed two per day. *Id.* Dr. Fejos also noted that Ms. Torres understood that that she was at maximum medical improvement. *Id.*

On June 6, 2016, Dr. Fejos noted that, while Ms. Torres limited her Percocet to two per day, she was very uncomfortable. June 6, 2016 Treatment Notes, Tr. at 547. Dr. Fejos noted pain which worsened with extension. *Id.* Dr. Fejos recommended Percocet and considered a future facet medial branch block. *Id.*

On August 30, 2016, Dr. Fejos reported that Ms. Torres had lower back pain, bilateral leg pain, and pain everywhere. August 30, 2016 Treatment Notes, Tr. at 546. Dr. Fejos mentioned that Ms. Torres was diagnosed with fibromyalgia and sought pain management with no improvement. *Id.* Dr. Fejos also noted that Ms. Torres had a slow but steady gait, with pain during lumbar flexion, and paralumbar tenderness. *Id.* Dr. Fejos had no recommendations for her care. *Id.*

On November 21, 2016, Dr. Fejos reported that Ms. Torres was "miserable," with increased muscle tension throughout the lumbar region. November 21, 2016 Treatment Notes, Tr. at 545. Dr. Fejos noted that during the physical examination, Ms. Torres had pain with range of motion in all directions. *Id.*

### b. Physical Therapy Assessments

From October 2015 through December 2015, Ms. Torres utilized a physical therapy program at Gaylord Hospital supervised by Benjamin Simaitis, MSPT, CSCS.

On October 13, 2015, Mr. Simaitis noted that Ms. Torres had back pain both before and after surgery, which had prevented her from returning to work as a bus driver. Physical Therapy

Orthopedic Assessment, Tr. at 354. Ms. Torres also reported that her lower back pain ranged from an 8/10 to a 10/10. *Id.* The assessment created goals of decreasing pain to a 2/10 at worst within two weeks and 0/0 within eight weeks, and to increase lumbar limitations to seventy-five percent of normal within two weeks and one hundred percent of normal within eight weeks. *Id.* at 355.

On October 15, 2015, Mr. Simaitis reported that Ms. Torres's back was sore, and that pain increased with movement. October 15, 2015 Physical Therapy Orthopedic Visit Note, Tr. at 356. There was also no increase in back pain reported with strengthening activities. *Id.* And the same goals of two and eight weeks were present during this visit. *Id.*

On October 27, 2015, Mr. Simaitis reported that Ms. Torres's back was sore for unknown reasons. October 27, 2015 Physical Therapy Orthopedic Visit Note, Tr. at 358. Ms. Torres also noted an increase in back pain following exercise activities. *Id.* at 359.

On October 29, 2015, Mr. Simaitis reported that Ms. Torres had daily lower back pain, but she performed her therapy as often as possible. October 29, 2015 Physical Therapy Orthopedic Visit Note, Tr. at 650. And Mr. Simaitis assessed that Ms. Torres was self-limited with exercise progression due to pain and anxiety. *Id.* at 651.

On November 3, 2015, Mr. Simaitis indicated that Ms. Torres's back pain felt good. November 3, 2015 Physical Therapy Orthopedic Visit Note, Tr. at 652. Ms. Torres tolerated additional sitting and standing exercises, with no increase in pain. *Id.* at 653.

On November 10, 2015, Mr. Simaitis reported that Ms. Torres reported minimal back pain. November 10, 2015 Physical Therapy Orthopedic Visit Note, Tr. at 654. Mr. Simaitis noted that Ms. Torres was progressing slowly with exercises and activities. *Id.* at 655.

On November 12, 2015, Mr. Simaitis reported that Ms. Torres stated that her back was

not hurting as much, and strength was improving. November 12, 2015 Physical Therapy Orthopedic, Tr. at 656. At the visit, Ms. Torres tolerated exercise progression with no increased pain. *Id.* at 657.

On November 24, 2015, Mr. Simaitis reported that Ms. Torres had lower back pain, which slightly improved since the start of physical therapy. November 24, 2015 Physical Therapy Orthopedic Progress Note, Tr. at 361. The progress notes also highlighted that Ms. Torres "ha[d] been cleared to return to work light duty," but that she reported "continued difficulty with household chores-bending, lifting, twisting." *Id.* There was also a note that Ms. Torres's backward bending pain limited Ms. Torres to less than fifty percent of normal, forward bending to seventy-five percent of normal, left-side bending to seventy-five percent of normal, and right-side bending to fifty percent of normal. *Id.*

On December 8, 2015, Mr. Simaitis reported continued pain in her lower back. December 8, 2015 Physical Therapy Orthopedic Visit Note, Tr. at 664. At the visit, Ms. Torres tolerated treatment with moderate difficulty and was able to complete all her exercises. *Id.* at 665.

On December 16, 2015, Philip Silverio, PT reported minimal change in pain since Ms. Torres's last session. December 16, 2015 Physical Therapy Orthopedic Visit Note, Tr. at 363. Mr. Silverio noted that Ms. Torres continued to present decreased exercise tolerance due to pain but was able to complete rehab session. *Id.* at 364. The stated physical therapy goals were to decrease pain to a 2/10 at worst within two weeks and 0/0 within eight weeks, and to increase lumbar limitations on all plains to seventy-five percent of normal within two weeks and one hundred percent of normal within eight weeks. *Id.* at 363.

On December 30, 2015, Mr. Silverio reported that Ms. Torres continued to have pain in

her lower back. December 30, 2015 Physical Therapy Orthopedic Visit Note, Tr. at 365. Mr. Silverio noted that Ms. Torres was able to perform her exercises with a "mild increase in symptoms," but that the symptoms did not decrease. *Id.* at 366. The physical therapy goals were to decrease pain to a 2/10 at worst within two weeks and 0/0 within eight weeks, and to increase lumbar limitations on all plains to seventy-five percent of normal within two weeks and one hundred percent of normal within eight weeks. *Id.* at 365.

### c. Fibromyalgia Treatment Physician

On March 6, 2017, Dr. Douglas Olson, M.D. completed a fibromyalgia medical source statement. Fibromyalgia Medical Source Statement, Tr. at 842. Although Dr. Olson had only seen Ms. Torres twice over four months, he conducted a physical examination of Ms. Torres, and concluded that she met the American College of Rheumatology criteria for fibromyalgia, and that her impairment was likely to last at least twelve months. *Id.* at 832. Dr. Olson noted that Ms. Torres suffered from multiple tender points, non-restorative sleep, chronic fatigue, and depression. *Id.* Before the onset of pain, Dr. Olson recognized that Ms. Torres suffered from stress, fatigue, or movement overuse. *Id.* at 833.

When evaluating Ms. Torres's ability to work, Dr. Olson noted several limitations. Pain limited Ms. Torres to walking one to two city blocks. *Id.* Dr. Olson then identified that Ms. Torres could only sit, stand, or walk for less than two hours in an eight-hour workday and that she needs a job where she could shift from sitting, to standing, or walking at will. *Id.* Pain would limit any standing to ten minutes. *Id.* at 840. In his view, Ms. Torres must work in an environment where she can walk around every thirty minutes of an eight-hour workday for five minutes. *Id.* at 834. Ms. Torres would also have to take unscheduled breaks during the work. *Id.* During a typical day, Dr. Olson estimated that Ms. Torres would be off task for more than

twenty-five percent of the day. *Id.* at 835. And Ms. Torres would likely miss four days per month for impairments or treatment. *Id.*

When evaluating functional capacity, Dr. Olson noted other limitations. Ms. Torres rarely would be able to lift ten, twenty, or fifty pounds, while rarely lifting less than ten pounds. *Id.* at 834. Ms. Torres would occasionally be able to twist or stoop. *Id.* She rarely would be able to crouch or climb stairs. And she would never be able to climb ladders. She would also only occasionally be able to look down, turn her hear to the right or left, look up, or hold her head in a static position. *Id.*

Dr. Olson also noted that emotional factors contributed to the severity of Ms. Torres's symptoms and functional limitations. *Id.* at 832.

### d. Mental Health Evaluation

Ms. Torres has two separate mental health evaluations in her record.

First, on March 1, 2017, Marissa Bayerl, APRN, completed a mental health questionnaire for Ms. Torres after treating her from October 26, 2016 until January 25, 2017. Mental Health Questionnaire, Tr. at 829. Ms. Bayerl diagnosed Ms. Torres with generalized anxiety disorder, chronic pain associated with significant psychosocial dysfunction, and fibromyalgia. *Id.* In her clinical findings from mental health examinations, Ms. Bayerl found that Ms. Torres suffered from daily panic attacks, low mood, worsening irritability, anhedonia, and forgetfulness. *Id.* Ms. Bayerl's prognosis was that Ms. Torres's anxiety symptoms would improve with treatment, with mild symptoms persisting. *Id.*

When asked about Ms. Torres's symptoms, Ms. Bayerl noted that Ms. Torres suffers from anhedonia, appetite disturbance, persistent anxiety, mood disturbance, decreased energy, difficulty thinking and concentrating, hostility and irritability, and recurrent severe panic attacks.

*Id.* at 829–30.

When asked about Ms. Torres's daily functional ability, Ms. Bayerl noted that she would be aware of normal hazards and precautions, while attending to basic neatness and cleanliness standards all of the time; would be precluded from working in proximity to others, responding appropriately to changes in routine, interactions with the general public, and traveling to unfamiliar places up to five percent of the time; would accept instructions and respond appropriately to criticism from supervisors and get along with co-workers without unduly distracting them five- to ten-percent of the time; and would be precluded from dealing with normal work stress more than fifteen percent of the time. *Id.* at 830. All told, Ms. Bayerl estimated that Ms. Torres would be absent about two days each month and off task twenty percent of the time *Id.* at 830–31.

Ms. Bayerl also noted that Ms. Torres's psychiatric conditions exacerbated her experience of pain and other physical symptoms. *Id.* at 830.

Second, on March 9, 2017, Leslie DiMella, Psy. D. completed another mental health questionnaire for Ms. Torres. Mental Health Questionnaire, Tr. at 845. Dr. DiMella treated Ms. Torres twice a month from September 27, 2016 until the time of the questionnaire. *Id.* at 843. Dr. DiMella diagnosed Ms. Torres with generalized anxiety disorder, major depressive disorder, and chronic pain associated with significant psychosocial dysfunction, for which she treated Ms. Torres with individual psychotherapy. *Id.* Dr. DiMella also found that Ms. Torres experienced psychomotor agitation, constricted affect, irritable and depressed mood, concentration issues, and memory problems. *Id.*

Dr. DiMella additionally noted that Ms. Torres suffered from anhedonia, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, emotional isolation,

decreased energy, difficulty thinking or concentrating, memory impairments, hostility and irritability, and recurrent severe panic attacks. *Id.* at 833–34. Dr. DiMella suggested that these issues would not preclude Ms. Torres from working in proximity with others without being unduly distracted, accepting instruction and responding to criticism of supervisors, responding appropriately to changes in work setting, or dealing with normal stress. *Id.* at 844. But the issues would preclude her from traveling to unfamiliar places up to five percent of the time, getting along with co-workers and interacting with the general public from ten to fifteen percent of the time, and would preclude adhering to basic standards of neatness and cleanliness more than fifteen percent of the time. *Id.*

Because of her mental health issues, Dr. DiMella expects that Ms. Torres will be impaired for at least twelve months. *Id.* at 845. Dr. DiMella estimates that Ms. Torres would be absent from work for more than four days per month because of impairments or treatment. *Id.* at 844. And during a typical workday, Dr. DiMella believes that Ms. Torres would be off task twenty-five percent or more of the workday. *Id.* at 845.

Dr. DiMella also noted that Ms. Torres's psychiatric condition exacerbated her experience with pain or other physical symptoms. *Id.* at 844.

### e.    Consultative Examinations

On May 23, 2016, Dr. Virginia Rittner, M.D. made a consultative examination of Ms. Torres. As part of Ms. Torres's initial disability determination, Dr. Rittner determined that Ms. Torres suffered from severe degenerative disk issues in her back, but concluded that her statements of intensity, persistence, and functionally limiting effects were partially inconsistent with the objective medical evidence, but never stated what was inconsistent. Initial Disability Determination Explanation, Tr. at 77–78.

Dr. Rittner noted that in a face-to-face interaction with the field office, personnel did not observe any limitations or difficulties. *Id.* at 78. In contrast, "[t]here was no indication that there [was] opinion evidence from any source." *Id.* at 80. Dr. Rittner then concluded that Ms. Torres could work with the following exertional limitations: occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for six hours of an eight-hour workday, sitting for six hours of an eight-hour workday, and occasional stooping, kneeling, crouching, crawling, climbing of ramps or stairs, or climbing of ladders, ropes, or scaffolds. *Id.* at 79.

Dr. Rittner also noted that Ms. Torres had no manipulative, visual, communicative, or environmental limitations. *Id.* When assessing Ms. Torres's work capacity, Dr. Rittner concluded that Ms. Torres's past work was expedited, there were no limitations to unskilled work because of her impairment and she displayed the capacity for light work. *Id.* at 80–81. Dr. Rittner therefore concluded that Ms. Torres was not disabled. *Id.* at 81.

On June 23, 2016, Dr. Robert Weisberg, M.D. made a consultative examination of Ms. Torres. As part of the reconsideration of Ms. Torres's disability determination, Dr. Weisberg also stated that there were no changes in medical conditions since the initial determination. Reconsideration Disability Determination Explanation, Tr. at 96. Dr. Weisberg noted that he reviewed the evidence in the file and determined that the residual functional capacity assessment of Dr. Rittner was correct. *Id.* at 98. In contrast, "[t]here was no indication that there [was] opinion evidence from any source." *Id.* at 101.

Dr. Weisberg also agreed that Ms. Torres suffered from degenerative disk issues, but could work with the following exertional limitations: occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for six hours of an eight-hour workday, sitting for six hours of an eight-hour workday, and occasional stooping, kneeling, crouching, crawling,

climbing of ramps or stairs, or climbing of ladders, ropes, or scaffolds. *Id.* at 99–101. Dr. Weisberg concurred with Dr. Rittner that Ms. Torres could engage in light work and that she was not disabled. *Id.* at 102.

### 3.     Ms. Torres's Testimony

During the ALJ hearing, Ms. Torres testified that she was 48-years-old and lives with her husband and daughter. ALJ Hearing Transcript, Tr. at 37–38. Ms. Torres also noted that her husband had been disabled for twenty years. *Id.* at 38. She then testified that she had a driver's license but no car, had a GED, and last worked for First Student on September 11, 2015, as a school bus driver for eight years. *Id.* at 38–39.

Ms. Torres testified that she left her last job as a bus driver because she had a procedure performed on her back. *Id.* at 39. Before that job, she worked as a photographer for ECA National, as a cashier for Fleet Bank, and a housekeeper at a Jewish home for the elderly. *Id.* at 39, 53–54.

Ms. Torres next testified that she stopped working because of chronic pain throughout her body and back that limits her ability to sit and stand for extended periods, which worsened after her procedure. *Id.* at 39–40. This is a daily pain that constantly effects Ms. Torres's legs, arms, and back. *Id.* at 40. According to Ms. Torres, walking, sitting, and lifting exacerbate her back pain. *Id.* at 63. And laying down to prop her legs on a pillow is the only thing that improves the pain. *Id.* To address the pain, Ms. Torres testified that she had steroid injections and takes medicine for her pain in addition to seeing a pain and psychiatric doctors. *Id.* at 41–42.

Ms. Torres testified that her pain had limited her ability to lift anything beyond a gallon of milk, walk from her apartment to the mailbox without the use of a cane, stand for more than five to ten minutes, or sit for more than ten minutes. *Id.* at 43–44. Ms. Torres also testified that

her doctor diagnosed her with fibromyalgia between six and eight months before the ALJ hearing, which led to concentration issues and her pain in her arms and legs. *Id.* at 45–46. Ms. Torres testified that, as far back as October 2016, doctors at the Fairhaven Community Health suspected that Ms. Torres suffered from fibromyalgia, but she started having the pains before 2015 with a firm diagnosis in March 2017. *Id.* at 50–51.

Additionally, Ms. Torres stated that she had difficulty showering, dressing herself, cooking, cleaning, or doing laundry. *Id.* at 46–47. Ms. Torres testified that she does not drive, travel, go to the grocery store, have hobbies, or do anything socially because of her condition. *Id.* at 47–49. And can only walk about half of a city block, stand for ten to fifteen minutes, and sit for ten minutes. *Id.* at 57. Aside from watching television, she testified that she only looks outside of the window. *Id.* at 50. Because of her depression, Ms. Torres testified that she does not like to be around people, go anywhere, or do anything. *Id.* at 58.

Ms. Torres also testified that doctors diagnosed her with plantar fasciitis in her left foot in August 2015. *Id.* at 56.

Ms. Torres also testified that she suffers from panic attacks when she is stressed or anxious. *Id.* at 62.

### 4.    Vocational Expert Testimony

At the hearing, vocational expert Frank Samlaska testified regarding Ms. Torres's potential job market. When asked whether someone with Ms. Torres's age, education, and past work experience that is limited to sedentary exertion and could stay on task for eighty percent of the work day, Mr. Samlaska testified that Ms. Torres would be unable to perform her past work. ALJ Hearing Transcript, Tr. at 67–68. Mr. Samlaska did, however find that Ms. Torres could perform other work: a housekeeper, which had 135,093 jobs nationally and 1,470 in Connecticut;

a laundry sorter, which had 5,288 jobs nationally and 250 in Connecticut; and a package machine tender, which had 18,359 jobs nationally and about 198 jobs in Connecticut. *Id.* at 68–69. Mr. Samlaska then stated that his testimony was consistent with the *Dictionary of Occupational Titles*. *Id.* at 69.

When examined by Ms. Torres's attorney, Mr. Samlaska testified that his job data came from the Skill Tran job browser, which was based on the U.S. Department of Labor as of March 25, 2015. *Id.* Mr. Samlaska testified that there was no additional data as of September 2017. *Id.* at 70.

When asked about a hypothetical claimant, who would not be able to stay on task for more than eighty percent of a work day, Mr. Samlaska testified that such a claimant would be unable to work in any of the three jobs listed, nor work in any jobs in the national economy. *Id.* at 70.

When asked whether a hypothetical claimant unable to lift or carry ten pounds would be able to work any of the jobs suggested, Mr. Samlaska testified that claimant would be unable to perform any of those jobs. *Id.* at 71. And if the claimant was unable to work around moving parts or machinery, Mr. Samlaska testified that the claimant would be unable to work as a packaging machine tender. *Id.*

### 5.  ALJ Decision

On October 25, 2017, ALJ Thomas issued a notice of decision that found that Ms. Torres was not disabled. Compl. at ¶ 9; Tr. at 22. In its decision, the ALJ made the following eleven findings:

(1)  Ms. Torres meets the insured status requirements of the Social Security Act through December 31, 2020, *see* Tr. at 12;

(2)    Since September 11, 2015, Ms. Torres had not engaged in any substantially gainful activity, *see id.* (citing 20 CFR 404.1571, 416.971);

(3)    The combination of degenerative disc disease of the lumbar spine, fibromyalgia, obesity, generalized anxiety disorder, and major depressive disorder significantly limited Ms. Torres's ability to perform basic work activities, but Ms. Torres's plantar fasciitis was not medically severe, *see* Tr. at 12–13 (citing 20 CFR 404.1520(c), 416.920(c));

(4)    Although Ms. Torres suffers from some severe impairments, no treating or examining physician indicated that any single impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, *see* Tr. at 13–15 (citing 20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926);

(5)    Ms. Torres had the residual functional capacity to perform light work, except the occasional twisting, squatting, bending, balancing, crawling, kneeling, and climbing; no climbing of scaffolds, ropes or ladders; so long as there is a simple, repetitive routine that does not require teamwork or close work with the public; and there is only occasional interactions with co-workers, the public, and supervisors, *see* Tr. at 15–20 (citing 20 CFR 404.1567(b), 416.967(b));

(6)    Ms. Torres was unable to perform any past relevant work, *see* Tr. at 20 (citing 20 CFR 404.1565, 416.965);

(7)    At 46-years-old, Social Security Regulations define Ms. Torres was a younger individual based on alleged disability onset date, *see* Tr. at 21 (citing 20 CFR 404.1563, 416.963);

(8)     Ms. Torres achieved a high school education and was available to speak English, *see id.* (citing 20 404.1564, 416.964);

(9)     Transferability of job skills was not material to Ms. Torres's disability determination because the ALJ found that Ms. Torres was not disabled, regardless of whether her job skills were transferrable, *see id.* (citing SSR 82-41, 20 CFR 404, Subpart P, Appendix2);

(10)    Considering Ms. Torres's age, education, work experience, and residual functional capacity, there are jobs she can perform in the national economy, *id.* (citing 20 CFR 404.1469, 404.1569(a), 416.969, 416.969(a));

(11)    Under the Social Security Act, Ms. Torres was not disabled from September 11, 2015 through the date of the decision, *see* Tr. at 22 (citing 404.1520(g), 416.920(g)).

Based on Ms. Torres's application, supplemental filings, and the above-mentioned filings, ALJ Thomas denied Ms. Torres's disability application. *Id.*

### 6.     Appeals Council Decision

On April 13, 2018, the Appeals Council of the Social Security Administration denied review of the ALJ decision, finding "no reason under [its] rules to review the Administrative Law Judge's decision." Compl. at ¶ 11; Tr. at 1.

## B.     Procedural History

On June 8, 2018, Ms. Torres filed a Complaint against the Acting Commissioner. Compl.

On November 11, 2018, Ms. Torres moved for a judgment on the pleadings. Motion for Judgment on the Pleadings, ECF No. 20.

On January 10, 2019, the Acting Commissioner moved to affirm the decision. Motion to

Affirm the Decision, ECF No. 25.

On January 29, 2019, Ms. Torres issued a Response to the Acting Commissioner's Motion to Affirm. Response to Motion to Affirm, ECF No. 28.

## II.   STANDARD OF REVIEW

Under the Social Security Act, "a claimant must establish an 'inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Smith v. Berryhill*, 740 F. App'x. 721, 722 (2d Cir. 2018) (summary order) (citing 20 C.F.R. § 404.1505(a)).

To determine whether a claimant is disabled, the ALJ must follow a five-step evaluation process:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v)). "[T]he claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four," *see Burgess*, 537 F.3d at 128 (internal quotation marks and citation omitted), with Step Five "the burden shift[ing] to the Commissioner to show there is other work that [the claimant] can perform," *see Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012).

"A district court reviewing a final . . . decision [of the Commissioner of Social Security]

pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on the correct legal standard." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). A district court can reverse the commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown v. Apfel*, 174 F.3d 59, 61 (2d Cir. 1999) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted). While the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay*, 562 F.3d at 507 (internal quotation marks and citations omitted). "[A district court] must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Petrie v. Astrue*, 412 F. App'x. 401, 403–04 (2d Cir. 2011) (summary order) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)) (internal quotation marks omitted).

To determine "whether the agency's findings are supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). "Even if the Commissioner's decision is supported by substantial evidence, legal error

alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). When "the Commissioner's decision applies the correct legal principles and is supported by substantial evidence, that decision will be sustained." *Kumar v. Berryhill*, 3:16-cv-1196 (VLB), 2017 WL 4273093, at *4 (D. Conn. Sept. 26, 2017) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

## III. DISCUSSION

### A. Treating Physician Rule

The treating physician rule gives "deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Greek*, 802 F.3d at 375. Failure to provide "'good reasons' for not crediting the opinion of a claimant's treating physician" can be a basis for remand. *Id.* at 129–30 (quoting *Snell*, 177 F.3d at 133).

As to the nature and severity of a claimant's impairments, "[t]he SSA recognizes a rule of deference to the medical views of a physician who is engaged in the primary treatment of a claimant." *Greek*, 802 F.3d at 375; *see also Burgess*, 537 F.3d at 128. The treating physician's opinion "is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)

(citations omitted).[4]

Where an ALJ does not assign "controlling weight" to a treating physician's opinion, they must "consider certain factors to determine how much weight to give it, and should articulate 'good reasons' for the weight given." *See Camille v. Colvin*, 652 F. App'x. 25, 27 (2d Cir. 2016) (summary order) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)); *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1998) (requiring an ALJ to "provide a claimant reasons when rejecting a treating source's opinion"); *Schrack v. Astrue*, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) ("The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion.").

As part of the ALJ's affirmative duty to develop the administrative record, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79. There are, however, cases where the treating physician should not be provided controlling weight. *See, e.g.*, *Halloran*, 362 F.3d at 32 (holding that "the option of treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in support, such as the opinions of other medical experts"). The treating physician's opinion is not afforded controlling weight where "the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Id.*

"[T]o override the opinion of the treating physician," the ALJ must consider, under the relevant regulations, factors including "(1) the frequently, length, nature, and extent of treatment;

---

[4] On March 27, 2017, new regulations took effect that effectively abolish the treating physician rule; for claims filed before March 27, 2017, however, the treating physician rule continues to apply. *See* 20 CFR § 416.927; *Smith v. Comm'r of Soc. Sec. Admin.*, 731 F. App'x. 28, 30 n.1 (2d Cir. 2018) (summary order).

(2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129). "'An ALJ does not have to explicitly walk through these factors, so long as the Court can conclude that the ALJ applied the substance of the treating physician rule[.]'" *London v. Comm'r of Soc. Sec.*, 339 F. Supp. 3d 96, 102 (W.D.N.Y. 2018) (quoting *Scitney v. Colvin*, 41 F. Supp. 3d 289, 301 (W.D.N.Y. 2014)). The ALJ "must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33 and citing 20 C.F.R. § 404.1527(d)(2)).

Ms. Torres argues that ALJ Thomas impermissibly gave great weight to the opinions of agency consultants, while discounting the opinions of her treating physicians. Memorandum in Support of Motion for Judgment on the Pleadings, ECF No 20-1 ("Mem. in Supp. of Mot. for J. on the Pleadings"), at 10–11. The agency consultants also based their review on a limited medical record that ended in May 2016, before Ms. Torres started treatment with Dr. Marks or doctors diagnosed her with fibromyalgia, before she started treatment with Dr. Olson and had her diagnosis of fibromyalgia confirmed, and before she started mental health treatment or doctors diagnosed her with depression, anxiety, and chronic pain associated with psychosocial dysfunction. *Id.* at 11–12. Accordingly, in her view, the agency consultants never saw any mental health or fibromyalgia treatment records before rendering their opinions. *Id.* at 12. As for Dr. Weisberg, Ms. Torres argues that there is no evidence that he reviewed the records. *Id.*

Ms. Torres also argues that the agency consultant opinions are not consistent with the rest of the medical evidence. Ms. Torres contends that the recognition of degenerative disk disease of the lumbar spine precludes a residual functional capacity determination. *Id.* at 13. Even then, the

consultant opinions do not form a sufficient basis for the residual functional capacity and exertional determinations ALJ Thomas found. *Id.* at 13. And the opinions relied on do not show a normal gait, are from an unrelated neurological examination, and is inconsistent with Ms. Torres's own testimony that she had to use a cane, could not lift more than a gallon of milk, and could not handle laundry or a vacuum. *Id.* at 13. According to Ms. Torres, the combined weight of this contradictory evidence negates the opinion of the agency consultants and the ALJ's determination. *Id.*

Ms. Torres then argues that the ALJ's determination granting Dr. Dimella's opinion little weight was unsupported by the record for four reasons. First, Ms. Torres evaluated Ms. Torres seventeen times between September 27, 2016 and June 14, 2017, which includes documentation, patient histories, medication trials, and mental status evaluations. *Id.* at 14. Second, there is no legal basis for discounting Ms. Torres's medical history solely because she was never hospitalized. *Id.* Third, the ALJ's conclusion that medication ameliorated Ms. Torres's symptoms is unsupported by the record evidence that her condition deteriorated over time. *Id.* Fourth, medical software references of her as pleasant, cooperative, alert, oriented, and having a normal mood, should have no bearing on the severity of Ms. Torres's underlying mental health disorders. *Id.* at 15.

Ms. Torres next argues that the ALJ's determination granting Dr. Fejos opinion no weight because it did not include a function-by-function analysis is unsupported because ALJ Thomas made no attempt to fill in the gaps in the administrative record. *Id.*

Ms. Torres finally argues that the ALJ's determination granting Dr. Olson's opinion little weight because he only saw Ms. Torres twice is negated by relying on agency consultants that never examined Ms. Torres. *Id.*

Because of the ALJ's failure to make a weight determination of the treating physician evidence and resolve any inadequacies, Ms. Torres argues that the ALJ's determination was deficient. *Id.* at 16–17.

In response, the Acting Commissioner argues that ALJ Thomas properly relied on state agency consultants, and the substantial evidence in the record supported the consultant conclusions. The Acting Commissioner argues that Dr. Virginia Rittner and Dr. Robert Weisberg reviewed medical records from May 23, 2016 until June 23, 2016 to render their conclusions. Memorandum in Support of Motion for an Order Affirming the Commissioner's Decision, ECF No. 25-1 ("Mem. in Supp. of Mot. to Affirm"), at 4. ALJ Thomas also relied on several physical examinations that concluded Ms. Torres was able to walk effectively, retained her muscular strength, and had normal coordination. *Id.* at 5. The ALJ then analyzed post-surgical records confirming Ms. Torres's improving strength and recovery, which led to a determination that she could return to sedentary and light work. *Id.* 5–7.

Even after Ms. Torres's fibromyalgia diagnosis, the Acting Commissioner noted that Ms. Torres did not exhibit additional pain or swelling, while retaining a normal range of motion in her legs, arms, and neck. *Id.* at 7. The Acting Commissioner also noted that Ms. Torres reported to her physical therapist that she could manage most of her personal care, lift weight, and perform light duties related to homemaking and employment. *Id.* Ms. Torres also testified that she took a car trip from Connecticut to Virginia around the same time. *Id.* The Acting Commissioner also contends that Ms. Torres reported to multiple treating sources that medication allowed her to manage her fibromyalgia pain. *Id.* at 8.

The Acting Commissioner further argues that the ALJ should have given great weight to the agency consultants at the expense of Ms. Torres's treating physicians. The Acting

Commissioner argues that the treating source opinions were inconsistent with the substantial evidence pertaining to clinical and diagnostic findings, Ms. Torres's own opinions regarding her recovery, and the consultant opinions. *Id.* at 10–12. The Acting Commissioner also argues that the mental health questionnaires completed by Ms. Torres's providers were at odds with an administrative record that found that she was pleasant, cooperative, alert, well-oriented, with an intact judgment, had organized and coherent thought process, and improved with prescription medicine and psychotherapy. *Id.* at 13–14. And the Acting Commissioner raises inconsistencies in the medical evaluations Ms. Torres relies upon. *Id.* at 14–16.

The Acting Commissioner also argues that ALJ Thomas adequately developed the record. Even though state agency consultants only reviewed a limited record, there were no obvious gaps that would prevent ALJ Thomas from making the final disability determination. *Id.* at 16–17. The Acting Commissioner argues that the ALJ makes the residual functional capacity determination, and there is nothing to indicate that those findings were inconsistent with the substantial evidence in the administrative record. *Id.* at 18–19.

In reply, Ms. Torres argues that ALJ Thomas's evaluation of the treating physician opinion evidence was deficient. Ms. Torres primarily argues that ALJ Thomas should have given Dr. Fejos's opinion greater weight as the treating physician, rather than the opinion of Virginia Rittner, who based her assessment on field office notes from an untrained source. Reply at 1–4. Ms. Torres then questioned the efficacy of discounting treating physician opinions of Dr. Fejos, who saw Ms. Torres nineteen times, and Dr. Olson, who saw Ms. Torres twice, in favor of opinions from two consultants that never saw Ms. Torres in person. *Id.* at 4–5.

The Court agrees.

Here, ALJ Thomas gave varying degrees of weight to the opinions within the record. The

ALJ gave great weight to the agency medical consultants, Dr. Rittner and Dr. Weisberg, because of their familiarity with Social Administration disability standards and comprehensive review of the medical evidence. Notice of Decision, Tr. at 18–19. The ALJ gave little weight to the physical therapy assessments of Mr. Simaitis. *Id.* at 19. The ALJ also gave little weight to Dr. Fejos's assessment that Ms. Torres was unable to perform her job functions because of vagueness, a lack of function-by-function analysis, and inconsistency with the record. *Id.* The ALJ gave little weight to Dr. Olson's medical source statement because Dr. Olson had only seen Ms. Torres twice in a four-month period and his findings were supposedly inconsistent with other record evidence. *Id.* And the ALJ gave little weight to the to the mental health questionnaires submitted by Ms. Bayerl or Dr. DiMella because of a lack of support with record evidence from non-psychiatric physicians. *Id.* at 20.

The Second Circuit has cautioned ALJs from "rely[ing] heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419; *see Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) (justifying giving a consultative physician limited weight "because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons'" (quoting *Torres v. Bowen*, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988)). At the same time, "the report of a consultative physician may constitute [substantial] evidence." *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *see also Prince v. Astrue*, 490 F. App'x. 399, 401 (2d Cir. 2013) (summary order) ("consultative examinations were still rightly weighed as medical evidence"); *Petrie v. Astrue*, 412 F. App'x. 401, 405 (2d Cir. 2011) (summary order) ("the report of a consultative physician may constitute . . . substantial

evidence").

In this case, however, there is no indication that Dr. Rittner or Dr. Weisberg based their consultative opinions on the entirety of the medical evidence available.

On May 23, 2016, Dr. Rittner's opinion is based on the face-to-face observations made in the field office. Initial Disability Determination Explanation, Tr. at 80. At that point, Dr. Fejos had treated Ms. Torres for more than a year, *see* Tr. at 373–85, 781–88 (collectively detailing Ms. Torres's back treatment records from October 2014 until April 2016), and more than two months of physical therapy records, *see* Tr. at 354–365, 650–665 (collectively detailing Ms. Torres's physical therapy). Yet Dr. Rittner stated that there was "no indication that there is opinion evidence from any source." Tr. at 80.

On June 23, 2016, Dr. Weisberg based his opinion on a review of the record and the conclusion that "[t]he RFC by Dr. Rittner on 5/23/16 is correct." Reconsideration Disability Determination Explanation, Tr. at 98. Between Dr. Rittner's and Dr. Weisberg's consultative examinations, however, Dr. Fejos examined Ms. Torres on June 6, 2016 and noted that Ms. Torres limited her Percocet to two per day and was extremely uncomfortable, with pain with both flexion and extension during her physical examination—which worsened with extension. Tr. at 547. Yet Dr. Weisberg stated that "[t]here is no indication that there is opinion evidence from any source." Tr. at 101.

Between Dr. Weisberg's reconsideration and ALJ Thomas's disability determination, Dr. Fejos had two more examinations, where Ms. Torres reported lower back pain, bilateral leg pain, pain during lumbar flexion, and paralumbar tenderness during one examination and described her condition as "miserable" with pain throughout her range of motion in any direction in another, *see* Tr. at 545–46, and doctors diagnosed Ms. Torres with fibromyalgia, *see* ALJ

Hearing Transcript, Tr. at 50–51. And Dr. Olson provided a medical source statement on Ms. Torres's fibromyalgia diagnosis that detailed sitting, standing, walking, rest, task management, and absentee limitations that would likely prevent full-time employment, *see* 833–35, 840, and found a residual functional capacity where Ms. Torres would have numerous lifting and movement limitations, *see* Tr. at 834.

ALJ Thomas nevertheless based the decision that Ms. Torres was not disabled on the combined consultative opinions of Dr. Rittner and Dr. Weisberg, while giving limited weight to any countervailing evidence from her physical therapist, treating physician for her back, and treating physician for her fibromyalgia. *See* Tr. at 18–19. Moreover, the ALJ gave the greatest weight to two consultative examinations missing seventeen months of medical information, including all medical opinions related to Ms. Torres's fibromyalgia diagnoses.

In the Second Circuit, an ALJ has an "affirmative duty to compile a complete record" when ruling on eligibility. *Brown*, 174 F.3d at 63. The ALJ must "not only develop the proof but carefully weigh it." *Donato v. Sec'y. of Dep't. of Health and Human Servs.*, 721 F.2d 414, 419 (2d Cir. 1983). Accordingly, the district court conducts "a plenary review of the administrative record to determine whether, considering the record as a whole, the Commissioner's decision is supported by substantial evidence." *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw*, 221 F.3d at 131 (quoting 42 U.S.C. § 405(g)). In cases "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force," the district court will not substitute its "judgment for that of the commissioner."

*Veino*, 312 F.3d at 586. And the district court may not "affirm an administrative action on grounds different from those conducted by the agency." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

Here, the substantial evidence does not support ALJ Thomas's conclusion that the medical findings of two state agency consultants forming conclusions warrant a no disability finding. As part of the ALJ's affirmative duty to develop the administrative record, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa*, 168 F.3d at 79. But the weight of the medical evidence does not support this finding. ALJ Thomas failed to reconcile the evidentiary gaps between subsequent medical evidence and the conclusions by state agency consultants.

Moreover, the substantial evidence does not support the ALJ's conclusion that Ms. Torres was not disabled. To the contrary, the determination of every other medical opinion in the record contradicts that conclusion: from physicians that only examined Ms. Torres once,[5] twice,[6] or over the course of years.[7] Even utilizing the consultative evaluations, they are incomplete and inconclusive.[8]

Because the evidence does not support the ALJ's disability determination, the finding that Ms. Torres was not disabled is "not supported by substantial evidence in the record." *See Greek*, 802 F.3d at 374–75; *Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (finding that when there is a reasonable basis to doubt the ALJ applied the correct legal principles, the Court

---

[5] *See* Examination by Jodonna Scala, M.D., Tr. at 675–84 (recognizing that Ms. Torres would be unable to work due to a back injury).

[6] *See* Fibromyalgia Medical Source Statement by Douglas Olson, M.D., Tr. at 832–42 (noting that Ms. Torres would be unable to work due to her fibromyalgia ailment).

[7] *See* Certification of Health Care Provider for Employee's Serious Condition by Arpad Fejos, M.D., Tr. at 368–70 (finding that Ms. Torres could not perform her job functions due to her back issues).

[8] Initial Disability Determination Explanation, Tr. at 78, 80 (stating that Ms. Torres's statements were "partially consistent" with medical findings, but never stating the specifics of any inconsistencies, while making no effort to reconcile other opinion evidence); Reconsideration Disability Determination Explanation, Tr. at 100, 101 (same).

"cannot be certain whether or not the Commissioner's ultimate conclusion that plaintiff was not disabled is supported by substantial evidence"); *Rosa*, 168 F.3d at 79 ("an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.").

**B.     Step Three**

According to Social Security regulations, "the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations." *Talavera*, 697 F.3d at 151. "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act," *see Burgess*, 537 F.3d at 128, and "bears the burden of proving his or he case at steps one through four" of the five-step framework established by the social security regulations. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). A reviewing court will affirm ALJ's decision, so long as "the evidence of record permits us to glean the rationale of an ALJ's decision." *Mongeur*, 722 F.2d at 1040; *Chichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013).

To find physical disability, Social Security regulations require:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b . . .

20 C.F.R. § 404, Subpart P, App'x 1, § 1.02. Specific to spinal disorders, disability requires a "compromise of a nerve root (including the cauda equina) or the spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness)

accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . ." *Id.* at § 1.04.

Here, Ms. Torres's most recent treating physician notes indicate that that she has a spinal disorder and neuroanatomic distribution of pain in addition to fibromyalgia.

On August 30, 2016, Dr. Fejos reported that Ms. Torres had lower back pain, bilateral leg pain, and pain everywhere. August 30, 2016 Treatment Notes, Tr. at 546. Dr. Fejos mentioned that Ms. Torres was diagnosed with fibromyalgia and sought pain management with no improvement. *Id.* Dr. Fejos also noted that Ms. Torres had a slow but steady gait, with pain during lumbar flexion, and paralumbar tenderness. *Id.* Dr. Fejos had no recommendations for her care. *Id.*

On November 21, 2016, Dr. Fejos reported that Ms. Torres was "miserable," with increased muscle tension throughout the lumbar region. November 21, 2016 Treatment Notes, Tr. at 545. Dr. Fejos noted that during the physical examination, Ms. Torres had pain with range of motion in all directions. *Id.*

In addition, Dr. Olson's fibromyalgia medical source statement concluded that she met the American College of Rheumatology criteria for fibromyalgia, and that her impairment was likely to last at least twelve months. Fibromyalgia Medical Source Statement, Tr. at 832, 842.

Based on this record evidence, the ALJ unreasonably concluded that Ms. Torres was not disabled. The record instead supports that Ms. Torres has a musculoskeletal ailment under 20 C.F.R. § 404, Subpart P, App'x 1, § 1.02, because of her ongoing degenerative disk disorder and corresponding nerve pain, which satisfies Step Three of the disability evaluation process.

### C. Step Four

In any event, under the Fourth Step, the Court must determine, "whether, despite the

claimant's severe impairment, he or she has residual functional capacity to perform . . . her past work." *Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000) (citing *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998)). Step Four findings need only "afford [] an adequate basis for meaningful judicial review, appl[y] the proper legal standards, and [be] supported by substantial evidence such that additional analysis would be unnecessary or superfluous[.]" *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

Here, like the ALJ, the Court finds that Ms. Torres is unable to perform any past relevant work. *See* Tr. at 20 (citing 20 CFR 404.1565, 416.965). But, consistent with the treating physician rule, as noted above, the residual functional capacity determination of Dr. Olson, as well as her other treating doctors, makes that clear.

After physical evaluation, Dr. Olson noted that pain would limit Ms. Torres to walking one to two city blocks. Fibromyalgia Medical Source Statement, Tr. at 833 Dr. Olson then identified that Ms. Torres could only sit, stand, or walk for less than two hours in an eight-hour workday and that she needs a job where she could shift from sitting, to standing, or walking at will. *Id.* Pain would limit any standing to ten minutes. *Id.* at 840. In his view, Ms. Torres must work in an environment where she can walk around every thirty minutes of an eight-hour workday for five minutes. *Id.* at 834. Ms. Torres would also have to take unscheduled breaks during the work. *Id.* During a typical day, Dr. Olson estimated that Ms. Torres would be off task for more than twenty-five percent of the day. *Id.* at 835. And Ms. Torres would likely miss four days per month for impairments or treatment. *Id.*

When evaluating functional capacity, Dr. Olson noted other limitations. Ms. Torres rarely would be able to lift ten, twenty, or fifty pounds, while rarely lifting less than ten pounds. *Id.* at 834. Ms. Torres would occasionally be able to twist or stoop. *Id.* She rarely would be able to

crouch or climb stairs. And she would never be able to climb ladders. She would also only occasionally be able to look down, turn her hear to the right or left, look up, or hold her head in a static position. *Id.*

Dr. Olson's assessment also is consistent with the treating physician analysis of Dr. Fejos, the physical examination notes from Dr. Simaitis during Ms. Torres's physical therapy, and Ms. Torres's testimony during the ALJ hearing.

Accordingly, based on the substantial evidence in this record, Ms. Torres is unable to return to her past work under Step Four.

### D.      Step Five

After a claimant has proved that her residual functional capacity precludes a return to past relevant work, Step Five shifts the burden to the Acting Commissioner "to show there is other work that [the claimant] can perform." *Brault v*, 683 F.3d at 445. The ALJ may meet its burden "either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." *McIntyre*, 758 F.3d at 151.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant involved." *Calabrese v. Astrue*, 358 F. App'x. 724, 276 (2d Cir. 2009) (summary order) (internal citations omitted). To meet the burden of Step Five under the Social Security regulations, "[t]he Commissioner need show only one job existing in the national economy that [Claimant] can perform." *Bavaro v. Astrue*, 413 F. App'x. 382, 384 (2d Cir. 2011) (summary order) (citing 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1566(b)).

During the disability determination hearing, the ALJ asked the vocational expert whether someone with Ms. Torres's age, education, and past work experience, who was limited to

sedentary work and is unable to stay on task for more than eighty percent of the workday, could perform either Ms. Torres's past work or any other jobs. *See* Hearing Transcripts. Tr. at 67–68. And the vocational expert concluded that Ms. Torres would be unable to perform either her past work or any other local or national job. *Id.* at 68.

Later in the hearing, Ms. Torres's counsel asked whether someone limited to light exertional work and capable of repetitious work, with additional physical capabilities than Ms. Torres would find jobs in the local or national economy, if they were unable to stay on task for greater than eighty percent of the workday. *Id.* at 68, 70. The vocational expert responded that person would be unable to work and there would be no jobs that would allow someone with that profile to work. *Id.* at 70.

Ms. Torres's counsel then modified the hypothetical again with the limitation that a person with the same profile would be unable to lift or carry more than ten pounds. *Id.* at 71. And the vocational expert responded that would exclude the jobs the ALJ relied on to make a non-disability determination. *Id.*

When evaluating a disability determination, "[t]he Commissioner has the burden in Step Five of the disability determination to prove that the claimant is capable of working." *Bavaro*, 413 F. App'x. at 384. At Step Five, the ALJ must determine whether the claimant can do "other work existing in significant numbers in the national economy" based on the claimant's residual functional capacity. *Greek*, 802 F.3d 373 n.2 (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). Sufficient "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which [the claimant is] able to meet with [her] physical or mental abilities and vocational qualifications." 20 C.F.R. § 416.966 (b).

In its evaluation "[a]n ALJ may rely on a vocational expert's testimony regarding a

hypothetical as long as there is substantial evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflect the limitations and capabilities of the claimant involved." *See McIntyre*, 758 F.3d at 151 (internal citations and quotation marks omitted). The Acting Commissioner cannot meet its burden when there are only "[i]solated jobs that exist only in very limited numbers in relatively few locations outside of the region where" the claimant lives. 20 C.F.R. § 416.966 (b).

Here, the vocational expert testimony supports a disability finding at Step Five. When the ALJ accounted for all of Ms. Torres's functional limitations, the vocational expert found no jobs that she could perform in the local or national economy. "[F]or the testimony of a vocational expert to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations, both physical and mental supported by the record." *Harbock v. Barnhart*, 210 F. Supp. 2d 125, 134 (D. Conn. 2002) (Goettel, J.) (citation omitted). And "an ALJ's hypothetical should explicitly incorporate any limitations in concentration, persistence, and pace." *McIntyre*, 758 F.3d at 152. When "the ALJ asks the vocational expert a hypothetical question that fails to include or otherwise implicitly account for all of the claimant's impairments, then the vocational expert's testimony is not substantial evidence and cannot support the ALJ's conclusion that the claimant can perform significant numbers of jobs in the national economy." *Hernandez v. Berryhill*, No. 3:17-cv-368 (SRU), 2018 WL 1532609, at *18 (D. Conn. 2018) (internal quotation marks and citation omitted).

Both hypotheticals including all of Ms. Torres's functional limitations, consistent with the treating physician's rule, rendered the vocational expert unable to find jobs that she could perform. When asked whether someone with Ms. Torres's physical profile and an inability to stay on task for eighty percent of the workday could perform any jobs, the vocational expert

responded with a no. *See* Tr. at 67–68. Ms. Torres's counsel later added the eighty percent task limitation to another hypothetical with a more generous assessment of Ms. Torres's physical capacity, and the vocational expert again found that there would be no jobs in either the local or national economy for Ms. Torres. *Id.* at 68, 70. But these hypotheticals were more generous for staying on task than the treating source assessment of how often pain and treatment would allow Ms. Torres to work. *See* Fibromyalgia Medical Source Statement, Tr. at 835 (estimating that Ms. Torres would be off task for more than twenty-five percent of the day and could miss up to four days per month for impairments or treatment).[9]

Counsel again modified the hypothetical to a profile where unable to lift or carry more than ten pounds. *Id.* at 71. And the vocational expert responded that would exclude the jobs the ALJ relied on to make a non-disability determination. *Id.* This hypothetical again was more generous than the treating physician assessment where Dr. Olson noted that Ms. Torres would rarely never be able to lift ten, twenty, or fifty pounds, while rarely lifting less than ten pounds. *See* Fibromyalgia Medical Source Statement, Tr. at 834.

Based on the vocational expert testimony on this record, the ALJ erred in finding that Ms. Torres could find a job in the local or national economy under Step Five.

### E.    Remand

As the Second Circuit has noted, "[w]here application of the correct legal standard could lead to only one conclusion, we need not remand." *Schaal*, 134 F.3d at 504; *see also Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) ("[W]e have reversed and ordered that benefits be paid

---

[9] This assessment is also consistent with medical source statements from Ms. Torres's treating mental health physicians. *See* Mental Health Questionnaire, Tr. at 830–31 (Marissa Bayerl, APRN, determining that Ms. Torres would be absent about two days each month and off task twenty percent of the time); Mental Health Questionnaire, Tr. at 844–45. (Dr. Leslie DiMella determining that Ms. Torres would be absent four days each month and off task twenty-five percent or more of the workday).

when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."). Given the Court's determination on Step Five, only one outcome is possible: the "record is clear that if the opinion of plaintiff's treating physician controls, there are no jobs in the national economy that plaintiff can perform." *Morris v. Berryhill*, 313 F. Supp. 3d 435, 441(W.D.N.Y. 2018). "As such, additional proceedings would serve no proper purpose, and remand for the calculation and payment of benefits is warranted." *Id.*; *see also Torres v. Colvin*, No. 3:16-cv-809 (JAM), 2017 WL 1734020, at *3 (collecting cases remanding for calculation of benefits only where Commissioner does not meet Step Five burden).

Given the record and the deficiencies in the ALJ's decision identified above, rehearing is not warranted. Instead, the Court remands this case solely for the calculation and payment of benefits.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the motion for judgment of acquittal **DENIES** the motion to affirm the Commissioner's decision.

This case is remanded solely for the calculation and payment of benefits.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of August 2019.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE